[Civ. No. 206.   Fourth Appellate District.—June 19, 1930.]

YELLOW CAB MANUFACTURING COMPANY (a Corporation), Respondent, v. THE CITY OF SAN DIEGO (a Municipal Corporation), Appellant.

James E. O'Keefe, City Attorney, Harry S. Clark, Deputy City Attorney, and Arthur F. H. Wright for Appellant.

Sweet, Stearns & Forward and Elwin L. Eckert for Respondent.

CARY, P. J.—Plaintiff brought this action to recover from defendant a tax in the sum of $558.60 paid by plaintiff under protest. The matter was tried upon the following agreed statement of facts.

"(1) That plaintiff, Yellow Cab Manufacturing Company is a corporation duly organized and existing under and by virtue of the laws of the State of Maine, with its principal place of business in the City of Chicago, State of Illinois, and is and at all times in the complaint mentioned was engaged in the City of Chicago, State of Illinois, in the business of manufacturing taxicabs and shipping the same in Interstate Commerce to points in the United States of America outside of the State of Illinois. (2) That defendant, City of San Diego, is a municipal corporation of the State of California, in the County of San Diego. (3) That during the month of December, 1920, the plaintiff, being then and there the manufacturer and owner of nineteen (19) taxicabs delivered the same to the Chicago, Milwaukee & St. Paul Railway Company in the City of Chicago, State of Illinois, for shipment via said C. M. & St. P. Railway Company, the Atchison, Topeka & Santa Fe Railway Company and the San Diego & Arizona Railway Company to San Diego, California, consigning the same to the order of the shipper at the City of San Diego, State of California, and that said taxicabs were consigned by six negotiable bills of lading to the order of said Yellow Cab Manufacturing Company at San Diego, California, said bills of lading being dated and covering taxicabs as follows, to-wit: December 10th, 1920, bill of lading No. 55 covering three taxicabs complete, motor numbers 121450, 122125 and 122167. December 10th, 1920, bill of lading No. 56, covering three taxicabs complete, motor numbers 122133, 121466 and 121451. December 11th, 1920, bill of lading No. 57, covering three taxicabs complete, motor numbers 123131, 122148 and 122130. December 11th, 1920, bill of lading No. 58, covering three taxicabs complete, motor numbers,

121437, 122145 and 122151. December 14th, 1920, bill of lading No. 60, covering three taxicabs complete, motor numbers 121435, 121454 and 122158. December 17th, 1920, bill of lading No. 63, covering four taxicabs complete, motor numbers 121448, 121447, 122143 and 122155. That said bills of lading were duly indorsed by said plaintiff and sent by it to the United States National Bank of San Diego, in the City of San Diego, with drafts drawn by plaintiff on one M. L. Uhler, for the amount of and covering the purchase price of said taxicabs, which said drafts were attached by plaintiff to said bills of lading, and the same were sent to said Bank as aforesaid with instructions to said United States National Bank of San Diego to 'deliver said bills of lading to said M. L. Uhler only upon payment in full of the amount of said drafts. (4) That said plaintiff retained the ownership of all right, title and interest in and to said taxicabs until such time as the purchase price of the same would be paid in full by said M. L. Uhler. (5) That said taxicabs arrived at San Diego, California, a few days prior to the first day of January, 1921, and on said first day of January, 1921, were in the possession, custody and control of the Atchison, Topeka & Santa Fe Railway Company and the San Diego & Arizona Railway Company; that shortly prior to January 1, 1921, the said Atchison, Topeka & Santa Fe Railway Company and the San Diego & Arizona Railway Company had, without the knowledge and/or consent of plaintiff, caused the said taxicabs to be removed from the freight cars, in which the same had been transported from Chicago to San Diego, and placed the same in storage in the Pioneer Warehouse in said City of San Diego, and the said taxicabs were placed in said warehouse as aforesaid, subject to orders of said railway companies, and that at said time the said bills of lading with the said drafts attached thereto were held by and in the custody of the United States National Bank of San Diego, at San Diego, California. That no delivery of said bills of lading had been made on or prior to said first day of January, 1921, nor has delivery of said taxicabs or bills of lading ever been made to the said M. L. Uhler or any other person in the City or County of San Diego, for the reason that said drafts or any of them have never been paid, and the said bank, between the first

day of January, 1921, and the 14th day of June, 1921, continued to hold the said bills of lading and unpaid drafts in its custody and possession, and the said taxicabs were, between said last mentioned dates, held by said railway companies for the freight and storage charges due thereon by reason of transportation charges growing out of the shipment of the same from said City of Chicago to said City of San Diego, and the storage of the same in the said Pioneer warehouse at the said City of San Diego while waiting for the said Uhler to pay the said drafts and take up said bills of lading and obtain delivery of said taxicabs. (6) That on the first day of January, 1921, while the said taxicabs were stored in the said Pioneer warehouse as aforesaid and while the said bills of lading, with said drafts attached thereto, were in said bank as aforesaid, the city assessor of the City of San Diego assessed said taxicabs for taxation on account of the taxes of the city of San Diego levied and assessed for the year 1921 in the sum of $558.60, and the said city assessor, to enforce the assessment and payment thereof, levied upon the said taxicabs and noticed the same for sale, and was proceeding to sell the same on the 30th day of March, 1921, to pay the said amount of said taxes so assessed against said taxicabs as aforesaid. That the amount of said taxes claimed to be due said city by the said city assessor was the said sum of Five Hundred Fifty-eight and 60/100 ($558.60) Dollars, which amount was on the 29th day of March, 1921, paid by the said plaintiff to said City Tax Collector under protest. That prior to the payment thereof plaintiff duly and regularly protested the right of said city to collect said taxes; that said protest was based upon and alleged the unlawful and unauthorized assessment of said taxicabs for the same reasons as set forth in the complaint in this action; that said protest was not allowed and thereupon plaintiff paid said tax to said City tax collector. (7) That thereafter and on the 14th day of June, 1921, said Uhler, or any other person on his behalf, having wholly failed to pay said drafts representing the purchase price of said taxicabs, and having wholly failed to pay said purchase price, or any part thereof, plaintiff, by reason thereof, caused the said taxicabs to be transported and reshipped without the said City

of San Diego and without the County of San Diego, but not without the State of California, and that each and all of said taxicabs have ever since their reshipment as aforesaid from said city, remained without said city and were sold and disposed of by plaintiff without the City of San Diego and without the County of San Diego, State of California. (8) That on the 20th day of September, 1921, and within the time provided by law, plaintiff caused to be prepared and filed with the Common Council of the said City of San Diego its verified claim for the refund to plaintiff of the amount of said taxes, to-wit: the sum of Five Hundred Fifty-eight and 60/100 ($558.60) Dollars, being the sum paid by it to said City of San Diego for said taxes as hereinbefore stated; that said Common Council of said City of San Diego did thereafter and on the 13th day of October, 1921, by unanimous vote of the members thereof reject and disallow and refuse to pay the amount of plaintiff's said claim, or any portion thereof; that the said claim was in due and legal form and properly verified and that the only reason for the refusal by the said Common Council to pay the same was that the said Council believed the said taxicabs were taxable property within the City of San Diego, under the circumstances as herein set forth. That this stipulation is intended to cover all of the facts at issue in this case, leaving the Court to decide only whether under the facts as hereby agreed to, the said taxicabs were taxable by the said City of San Diego on said 1st day of January, 1921, and whether said plaintiff is entitled to a judgment for the recovery of the taxes so paid to said defendant, City of San Diego.''

The plaintiff alleged as reasons why the tax was illegal that at all times while the taxicabs were in San Diego they were in transit and had never acquired an actual situs in that city rendering them subject to taxation. The trial court held that the automobiles were still in interstate commerce and not liable for the tax and gave judgment in favor of plaintiff, from which judgment defendant appeals.

Counsel for both parties agree that if, at the time of the assessment, the taxicabs were still in interstate commerce they are not subject to taxation by defendant. The precise question involved then is, viewed from the standpoint of taxation by the City of San Diego were or were

not these taxicabs at the time the tax was assessed still in interstate commerce. ■ We say "viewed from the standpoint of taxation by the City of San Diego" advisedly because property may, at one and the same time be in interstate commerce in so far as the power of Congress to regulate it is concerned, and yet be subject to a local tax. This was held in *Board of Trade* v. *Olsen*, 262 U. S. 1 [67 L. Ed. 839, 43 Sup. Ct. Rep. 470], where, in referring to a contract between a shipper and the railway for hauling grain from the west *via* Chicago to eastern states, which contract gave to the shipper the right to remove the grain at Chicago for temporary purposes of inspection, weighing, etc., and then continue the shipment on to the eastern states, the court says, at page 849:

"Such a contract does not prevent the local taxing of the grain while in Chicago; but it does not take it out of interstate commerce in such a way as to deprive Congress of the power to regulate it, as is plainly intimated in the authority cited (p. 516), and expressly recognized in *Stafford* v. *Wallace*, 258 U. S. 495, 525, 526 [23 A. L. R. 229, 66 L. Ed. 735, 745, 42 Sup. Ct. Rep. 397]."

The broad general principles which control the determination of the question before us are laid down in *Champlain Realty Co.* v. *Brattleboro*, 260 U. S. 366 [25 A. L. R. 1195, 67 L. Ed. 309, at 314, 43 Sup. Ct. Rep. 146], as follows:

"When it is shipped by a common carrier from one state to another, in the course of such an uninterrupted journey, it is clearly immune. The doubt arises when there are interruptions in the journey, and when the property, in its transportation, is under the complete control of the owner during the passage. If the interruptions are only to promote the safe or convenient transit, then the continuity of the interstate trip is not broken . . . In other words, in such cases interstate continuity of transit is to be determined by a consideration of the various factors of the situation. Chief among these are the intention of the owner, the control he retains to change destination, the agency by which the transit is effected, the actual continuity of the transportation, and the occasion or purpose of the interruption during which the tax is sought to be levied."

The Supreme Court of the United States has considered the question here presented in a number of cases.

In 1894 the matter came before it in *Pittsburgh & Southern Coal Co.* v. *Bates,* 156 U. S. 577 [39 L. Ed. 538, 15 Sup. Ct. Rep. 415]. There plaintiff in error, a Pennsylvania corporation, was engaged in the business of buying coal in that state, loading it on barges on the Ohio and Mississippi Rivers and carrying it down the river for sale in Tennessee, Arkansas, Mississippi and Louisiana. A statute of Louisiana provided a $50 penalty for the selling of any coal until it had first been inspected as provided for in the act. Plaintiff having sold one boatload of coal in New Orleans without the required inspection, action was begun against it to recover the penalty and the Supreme Court of Louisiana held plaintiff liable. In the United States Supreme Court it was argued that, as the coal was mined in Pennsylvania and taken on the navigable waters of the United States through several states for the purpose of sale in those states, and as the coal was sold while still on these navigable waters, the Louisiana statute when attempted to be applied to plaintiff's activities was a regulation of interstate commerce, in conflict with the commerce clause of the federal Constitution, and, therefore, void. The court held *contra,* using the following language:

"The decision of the court in *Brown* v. *Houston,* 114 U. S. 622 [29 L. Ed. 257, 5 Sup. Ct. Rep. 1091], thus rendered, seems to be conclusive of the case now before the court. The property in this case, as in that, still belongs to the original owners in Pennsylvania, but is brought on the navigable waters of the United States, in boats and barges to Louisiana for the purposes of sale, and is subject to taxation and sale as any other property of the citizens of the United States is subject when it becomes incorporated into the bulk of the property of the country, unless there be some special exemption set forth why it should not be thus taxed and sold, of which there is none here."

In *Kelley* v. *Rhoads,* 188 U. S. 1 [47 L. Ed. 359, 23 Sup. Ct. Rep. 259], sheep from Utah, destined for Nebraska, were being driven through Wyoming, grazing as they went, the intention being to ship them by rail after they had passed through that state. While the court held that under the circumstances the Wyoming authorities could not tax

the sheep, it used the following significant language [188 U. S. 1, 47 L. Ed., at page 361, 23 Sup. Ct. Rep. 261] :

"The law upon this subject, so far as it concerns interference with interstate commerce, is settled by several cases in this court, which hold that property actually in transit is exempt from local taxation, although if it be stored for an indefinite time during such transit, at least for other than natural causes or lack of facilities for immediate transportation, it may be lawfully assessed by the local authorities."

In *American Steel & Wire Co.* v. *Speed*, 192 U. S. 500 [48 L. Ed. 538, 24 Sup. Ct. Rep. 365], plaintiff, a New Jersey corporation, operated various manufacturing plants in states other than Tennessee. Its common method of selling was to have solicitors canvass the jobbers in Tennessee and adjoining states and receive orders for goods. The articles ordered would then be manufactured at the various plants. To facilitate the delivery of its products the steel company selected Memphis, Tennessee, as a distributing point and made the following arrangement with the Patterson Transfer Company of that city. The products were shipped from these plants to Memphis in plaintiff's name as consignee, the Patterson Transfer Company received, sorted and stored them and made deliveries to the persons to whom the goods had been sold. The Patterson Company took no part in selling the goods but merely delivered the goods as instructed by the Steel Company. The Steel Company contended that the goods had acquired no situs in Tennessee since they were moving in interstate commerce from the place of manufacture for delivery to the persons to whom they had been sold. The court held the products to be taxable in Tennessee, using the following language:

"With these facts in hand we are of opinion that the court below was right in deciding that the goods were not in transit, but, on the contrary, had reached their destination at Memphis, and were there held in store at the risk of the steel company, to be sold and delivered as contracts for that purpose were completely consummated."

In *General Oil Co.* v. *Crain*, 209 U. S. 211 [52 L. Ed. 754, 28 Sup. Ct. Rep. 475], oil from wells in Pennsylvania and Ohio was shipped in tank-cars to Memphis, Tennessee,

and there placed in suitable sized containers for reshipment to fill orders in Tennessee and the several states adjacent thereto. The oil already sold and intended for distribution in states other than Tennessee was kept separate, marked "Oil already sold in Arkansas, Louisiana and Mississippi," and remained in Memphis only long enough to be properly distributed and shipped on to its ultimate destination. Oil ultimately to be sold in these same states, but not yet ordered, was kept in a separate tank marked "Oil to be sold in Arkansas, Louisiana and Mississippi," and remained there until orders were sent in. The court overruled plaintiff's contention that the oil already sold was moving in interstate commerce and held it subject to inspection by the authorities of Tennessee and subject to the payment of the fees for such inspection, saying:

"Its oil was not in movement through the state. It had reached the destination of its first shipment, and it was held there,· not in necessary delay or accommodation to the means of transportation, as in *State, Detnold, Prosecutor,* v. *Engle* [34 N. J. L. 425], *supra,* but for the business purposes and profit of the company. It was only there for distribution, it is said, to fulfill orders already received. But to do this required that the property be given a locality in the state beyond a mere halting in its transportation."

In *Bacon* v. *Illinois,* 227 U. S. 504 [57 L. Ed. 615, 33 Sup. Ct. Rep. 299], grain from the west had been shipped *via* Chicago destined for New York and Philadelphia under contracts with the railway company which permitted the temporary removal of the grain at Chicago for inspection, sacking, etc., after which it was to go on to New York and Philadelphia. Plaintiff had bought this grain and the shipping contracts from the original owners while the grain was still in transit from the west to Chicago, and had had the grain temporarily stored in grain elevators in Chicago for the purpose of inspection, etc., where it was to remain only long enough for that purpose and then to continue its journey to New York and Philadelphia. None of the grain was to be disposed of within the state of Illinois. Plaintiff contended that, since the grain was moving in interstate commerce, it was not subject to personal

property tax in Illinois, but the court in overruling this contention said:

"But neither the fact that the grain had come from outside the state, nor the intention of the owner to send it to another state, and there to dispose of it, can be deemed controlling when the taxing power of the state of Illinois is concerned. The property was held by the plaintiff in error in Chicago for his own purposes and with full power of disposition. It was not being actually transported, and it was not held by carriers for transportation. The plaintiff in error had withdrawn it from the carriers. The purpose of the withdrawal did not alter the fact that it had ceased to be transported and had been placed in his hands. He had the privilege of continuing the transportation under the shipping contracts, but of this he might avail himself or not, as he chose. He might sell the grain in Illinois or forward it, as he saw fit. It was in his possession, with the control of absolute ownership. He intended to forward the grain after it had been inspected, graded, etc., but this intention, while the grain remained in his keeping, and before it had been actually committed to the carriers for transportation, did not make it immune from local taxation. He had established a local facility in Chicago for his own benefit, and while, through its employment, the grain was there at rest, there was no reason why it should not be included with his other property within the state in an assessment for taxation which was made in the usual way, without discrimination."

In *Susquehanna Coal Co.* v. *South Amboy,* 228 U. S. 665 [57 L. Ed. 1015, 33 Sup. Ct. Rep. 712], plaintiff, a Pennsylvania corporation, shipped its coal from mines in Pennsylvania *via* the Pennsylvania railroad across New Jersey, destined for delivery in New York and states east thereof. The coal arriving at the port of South Amboy, New Jersey, consigned to plaintiff, was there to be transferred to bottoms and shipped to states east of New York. If, upon its arrival at South Amboy, bottoms were on hand, the coal was immediately transferred from the cars to the bottoms, otherwise it was dumped into a storage yard of the railroad company to be transferred to bottoms as they became available. Overruling the coal company's contention that the coal was in interstate commerce,

the court held the coal to be taxable by the city of South Amboy, saying at page 1016 (L. Ed.): "Up to the time of loading the bottoms, the title of the coal was in complainant." And at page 1017: "The coal, therefore, was not in actual movement through the state; it was at rest in the state, and was to be handled and distributed from there. Therefore, the principles expressed in *General Oil Co.* v. *Crain*, 209 U. S. 211 [52 L. Ed. 754, 28 Sup. Ct. Rep. 475], and *Bacon* v. *Illinois*, 227 U. S. 504 [57 L. Ed. 615, 33 Sup. Ct. Rep. 299], are applicable to it. The products in neither of those cases were destined for sale in the states where stored; the delay there was to be temporary,—a postponement of their transportation to their destinations. There was, however, a business purpose and advantage in the delay which was availed of, and while it was availed of, the products secured the protection of the state. In both cases it was held that there was a cessation of interstate commerce and subjection to the dominion of the state."

In *Doscher* v. *Query*, 21 Fed. (2d) 521, after stating that the commerce clause of the federal Constitution will not protect property from local taxation after its journey has ended, the court says: "And this is true notwithstanding the goods have been transported in interstate commerce to the place where they are sought to be taxed, and are intended for shipment into other states, if they have reached the destination of their first journey and are being held by the owner for disposition in the ordinary course of business, and the stoppage be not a mere temporary delay in transportation."

█ It remains to apply the principles thus enunciated to the facts in the case at bar. Plaintiff here expressly consigned the taxicabs in question to itself, thus retaining title until the drafts had been paid by Uhler. As not only the taxicabs themselves but the drafts likewise had both been sent to San Diego it is obvious that the sale was to be consummated in that city. The only reason why this was not done was that Uhler failed to pay the drafts. We then have a condition where property consigned to plaintiff in its own name has completed its journey and is stored in a warehouse in San Diego awaiting a sale in that city. By no course of reasoning could it be said that these

taxicabs were but temporarily halted in transit for "lack of facilities for immediate transportation," to use the language of *Kelley* v. *Rhoads, supra*. They "on the contrary had reached their destination . . . to be sold and delivered as contracts for that purpose were completely consummated," as said in *American Steel & Wire Co.* v. *Speed, supra*. The sole purpose for sending these taxicabs to San Diego was to effect their sale, and that sale was to be effected not at Chicago, where the taxicabs first began their journey, but at San Diego, which was their destination. The idea of shipping these taxicabs out of San Diego to some other part of California was purely an afterthought brought about solely because the first sale failed in consummation. This is clearly indicated by the fact that they remained in that city almost six months before they were started on their second journey. The facts fall squarely within the language used in *Susquehanna Coal Co.* v. *South Amboy, supra:* "The coal therefore was not in actual movement through the state; it was at rest in the state and was to be handled and distributed from there."

In none of the cases cited above, except *Pittsburgh & Southern Coal Co.* v. *Bates,* had the articles arrived at their ultimate destination. The purposes for which they were temporarily held in the locality assessing the tax were all purposes connected with transporting them to their ultimate destination. And yet these breaks in the continuity of the journey were held to take them out of interstate commerce sufficiently to subject them to local taxation. All the stronger are the facts here presented, where the goods had arrived at their ultimate destination a few days before the assessment date, had been placed in a public warehouse, no further transportation being contemplated and none, in fact, commenced for a period of nearly six months thereafter.

In a well-reasoned and well-considered opinion of the Supreme Court of Idaho, *Columbia Motors Co.* v. *Ada County,* 42 Idaho, 678 [48 A. L. R. 950, 247 Pac. 786], the court had under consideration a state of facts on all-fours with the case at bar, and, after reviewing the federal decisions on the subject, reached the conclusion that the automobiles were taxable.

Under the authorities above, we are satisfied that the taxicabs were on January 1, 1921, no longer moving in interstate commerce, and being within the City of San Diego were properly taxable by the authorities of that municipality.

Counsel for plaintiff has cited a number of decisions, in none of which, however, is the taxability of personal property under consideration. The only case involving taxation of any kind cited is *Robbins* v. *Taxing District of Shelby County,* 120 U. S. 490 [30 L. Ed. 694, 7 Sup. Ct. Rep. 592], and there the sole question was the validity of an occupation tax imposed by a county on traveling salesmen who represented commercial houses outside the state, and which case is not in point on the subject involved in this appeal.

For the foregoing reasons the judgment is reversed and the cause remanded to the trial court, with directions to enter judgment for the defendant.

Marks, J., and Barnard, J., concurred.